# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs June 19, 2002

## STATE OF TENNESSEE v. JERRY WAYNE POINTER

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-A-302     Cheryl Blackburn, Judge**

---

**No. M2001-02269-CCA-R3-CD - February 28, 2003**

---

The defendant, Jerry Wayne Pointer, was convicted of first degree premeditated murder and sentenced as a violent offender to life imprisonment without parole. On appeal, he contends that the trial court erred in denying his motions to suppress evidence seized from his person and his home, in ruling that his prior convictions were admissible for impeachment purposes, in allowing testimony of a prior violent incident between him and the victim, and, additionally, that the evidence at trial was insufficient to support his conviction for first degree premeditated murder. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and ROBERT W. WEDEMEYER, JJ., joined.

Ross E. Alderman, District Public Defender; Jeffrey A. DeVasher, Assistant Public Defender (on appeal); and Jonathan F. Wing, Assistant Public Defender (at trial), for the appellant, Jerry Wayne Pointer.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Katrin N. Miller and Bret T. Gunn, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The defendant raises the following issues on appeal:

> I. Whether the trial court erred in denying the defendant's motions to suppress evidence seized from his person prior to his arrest and from his residence;

II.  Whether the trial court erred in ruling that the defendant's prior convictions were admissible for impeachment purposes;

III.  Whether the trial court erred in ruling that a prior violent incident between the defendant and the victim was admissible as substantive evidence; and

IV.  Whether the evidence at trial was insufficient to support the defendant's conviction for first degree premeditated murder.

## FACTS

One of the defendant's issues on appeal questions the propriety of the trial court's rulings following two motions to suppress, with some of the witnesses testifying at the hearings as well as during the trial.  Accordingly, to place the motions and testimony into context, we will review the chronology of the prosecution of this matter.

On February 20, 2001, the defendant's motion to suppress the search of his residence was heard, with Detective Steve Cleek, Officer James Pearce, and Detective David Carrell of the Nashville Metro Police Department testifying for the State and Dr. Pamela Auble testifying for the defendant.  On March 16, 2001, the trial court considered the defendant's motion to suppress the search of his person, relying upon the testimony from the hearing on the previous motion to suppress.  Since, in our review of the rulings of the trial court on the two suppression motions, we consider the evidence presented both during the hearings on the motions as well as at trial, we will set out the trial testimony with references, where appropriate, to the testimony presented during the two suppression hearings.

Sometime before midnight on September 20, 1999, Delores Morris was standing outside her house at 2403 Buchanan Street in Nashville when she heard the sounds of breaking glass and "a woman hollering, screaming," coming from 2407 Buchanan where the defendant lived with his girlfriend, the victim in this case, Teresa Ann Barksdale.  Concerned, Morris moved closer to the defendant's house to investigate.  She thought she saw someone come out the defendant's window, but then the lights went out and there was no other activity.  Going about her business, Morris left the neighborhood.  Upon her return thirty minutes later, she observed a burning fire in the backyard of 2405 Buchanan, an abandoned house between her house and that of the defendant, and called the police to alert them to the fire.  Based on her earlier observations of the activity at the defendant's house, Morris also told the police that she thought it was a body that was burning.

The Nashville Metro Fire Department arrived at the scene and began extinguishing what Captain Herbert Williams characterized as a small "trash fire."  According to Captain Williams' testimony, they quickly put out the fire and then he noticed what he thought was a body.  To get a closer look, he shined his flashlight and observed "teeth and a small framed person."

Sergeant Antionette Regnier, a Metro police officer for nine years, testified as to the condition of the victim's body:

> [The victim's] hands were behind [her] back. There was a phone cord . . . wrapped around the person's neck. The feet were gone, and I thought – I found out later this is what happens when a body burns, but it looked like someone had tried to chop up the body, dismember it, because of the way the skin was open, and the body was very badly – it just looked really bad, and I had never seen one look like that.

Sergeant Regnier proceeded to secure the scene and notify homicide detectives.

On the scene by this point were Officer James Pearce and Detective Steve Cleek who initiated a canvas of the neighborhood, first approaching the defendant's house because it was next door to the crime scene. They noticed a shattered window, with the broken glass still on the porch. The defendant answered the door wearing only his boxer shorts, dress socks, and house shoes. When asked about the matter, the defendant initially said he had not seen or heard anything but then said he had noticed the fire and the firefighters next door. He explained that he did not report the fire because he liked to keep to himself. He said that the window was broken earlier that night when he drunkenly leaned up against it. However, neither Pearce nor Cleek believed that the defendant was intoxicated at the time they talked with him. The defendant told them that his "old lady," Teresa Barksdale, and her two children also lived with him, spelling her name as "B-A-R-S-D-A-L-E." He said that the children were asleep and that Barksdale was a crack addict and a prostitute who generally walked the streets all night long, so "he wasn't too concerned about her." With the defendant's consent, Pearce and Cleek performed a "health and welfare" check to make sure the children were safe. They entered the house, walked directly to the children's bedroom, and saw that they were asleep. Cleek observed that the "curtains were down on the bed" in another bedroom of the house. As they were leaving the house, Pearce noticed what appeared to be grass on the defendant's shirtless back. Pearce asked the defendant whether it was grass or paint on his back and he replied that it was paint; however, Pearce determined that it was grass by brushing some off the defendant's back. Cleek testified that the defendant "was real short with his answers and he seemed nervous and kind of like shaky" and did not ask about the fire. Pearce and Cleek finally left, informing the defendant that someone might return to ask additional questions.

Officer Pearce and Detective Cleek, now joined by Detective David Carrell, subsequently returned to the defendant's house. This time, the defendant came to the door wearing blue jeans, with the officers' testimony differing as to whether he was wearing a shirt. Because the defendant had changed into pants with pockets, Officer Pearce told him, "[T]here is a dead body next door. If you don't mind, . . . I'm going to pat you down and make sure you don't have any weapons," to which the defendant replied, "[T]hat's fine." The defendant was found to have a pocketknife in one pants pocket and a cigarette lighter in the other.

Detective Carrell asked the defendant about the broken window, and testified that this time the defendant said that he intentionally punched the window during a Monday night football game because he was upset that the Dallas Cowboys lost.

Carrell then entered the defendant's house a second time, describing at trial what he saw:

> [A]s I began to look around, I saw blood. I saw – I went into the master bedroom. I saw blood on a telephone and the cord, all down the cord, just spiraling down, it was blood. . . . [T]he boots at the foot of the bed had blood, what appeared to be blood. There was [sic] some matches on the bed.
>
> Next to the bed at the head of the bed, against the wall where the window was that was broken was kind of a nightstand, a little chest, a little table, and it had blood on it, and some of it was a little thick, drops of kind of thick blood, what I thought to be blood, and then there was blood on the floor. There was a folding chair that was spattered all over with blood, just everywhere, lower rungs, back, seat, under the seat. There was some that was cast-off blood against the wall.

Because he realized a more thorough search would be required, Carrell ordered everyone out of the house so that he could obtain a search warrant, which, subsequently, was obtained and executed. Additionally, officers saw blood on a backpack and in the kitchen and found a trash bag containing blood-saturated shorts and boxer shorts, as well as an empty bottle of bleach and bleach-soaked rags that appeared to have been used in a cleaning attempt. A lighter, matches, and a butcher knife were found in the immediate vicinity of the defendant's house, and a can of charcoal lighter fluid was found near the victim's body. Blood was found on the defendant's person, and his hands had what appeared to be fresh cuts and bruises.

The defendant was placed under arrest for the murder of the victim[1] and taken into custody. At the police station, Detective Carrell again spoke with the defendant who repeatedly said that he did not understand what was happening. Reading from his supplemental report, Carrell testified as to what he told the defendant:

> I believe that the relationship between you and [the victim] had deteriorated to the point that your confrontations had become increasingly physical and violent. He [the defendant] nodded his head up and down affirmatively. I said, When you got home from work last night around 5:00, you never dreamed that within a few hours, you would get so angry at [the victim] that you would hurt her.

---

[1]The victim's body had been identified by a family member by this point.

-4-

He nods his head from side to side, and I said, Before you knew it, you were hitting her. You pushed her through the window. You chased her through the backyard and into the yard next door . . . and then by that time, you were so angry, you strangled her, tied her up, and set her on fire. Then you were afraid. You tried to clean up the blood in the house. You changed your clothes and hoped all this was just a bad dream, a nightmare. He nodded his head up and down. I said, Jerry, when you first met [the victim], you would never have thought in a million years that it would end like this. You would have never believed that some day, you would get so angry at this woman . . . that you would end up killing her. He nodded his head from side to side . . . negatively.

Tara Barker, employed as a special agent forensic scientist by the Tennessee Bureau of Investigation ("TBI"), testified that test results showed petroleum distillate, an ingredient commonly found in charcoal lighter fluid, was present on the victim's shirt. TBI Special Agent Forensic Scientist Michael Turbeville testified that forensic DNA tests showed that it was the victim's blood that was found on the defendant's person and the cigarette lighter found in his pocket, as well as on the mattress, boots, boxer shorts, and chair seized by the police.

An autopsy of the victim showed that her death was a homicide caused by manual strangulation which, according to the medical examiner's testimony, requires constant pressure on the victim's throat, the victim generally losing consciousness after thirty to forty seconds and dying after three to four minutes. The victim had been beaten before she was killed; a telephone wire was wrapped around her neck four times and then run down her back where it was wrapped around her wrists. A piece of glass was embedded in her breast. Her skin was extensively charred, and severe heat had caused her legs to fracture and her skin to split open in many areas. The medical examiner testified that the victim was dead before she was set on fire. No drugs or alcohol were found in her system. Although the cause of death was manual strangulation, the medical examiner testified that either the ligature strangulation or the fire was sufficient to cause death.

At trial, a neighbor testified as to an incident that occurred four or five weeks before the murder. Sometime between 1:30 and 2:00 a.m. at that earlier time, Larry Clopton, who lived across the street from the defendant, responded to loud knocking at his front door. Opening the door, Clopton saw the defendant hiding behind a van and the victim in front of the next-door neighbor's house trying to get inside. The victim was wearing only a slip and her foot was bleeding. Clopton and his wife brought the victim inside their house, and the defendant returned to his house across the street. According to Clopton's testimony, the victim was "hysterical, terrified, fearing for her life," and kept repeating, "[H]e is going to kill me, he is going to kill me." Clopton added that the victim said she and the defendant had been fighting and she had to jump out a window because the defendant was going to kill her. Clopton then telephoned the victim's family to come get her.

While they were waiting for the victim's family, the defendant knocked on Clopton's door and asked to speak with the victim. Clopton went outside and spoke with the defendant who appeared calm and convinced Clopton that the incident was over and that he just wanted to talk with the victim. Fearing that the defendant was armed, the victim was reluctant to come outside. The victim searched the defendant but found nothing. The victim's sister, Fay Cummins, and brother-in-law arrived to pick up the victim and, as they were leaving, the defendant suddenly attacked the victim. Clopton testified: "[H]e broke for her . . . and he started beating her in the back of the head, and in her back, and then he reach[ed] in his back pocket and pull[ed] out this butcher knife." The victim's sister testified that "as [the victim] proceeded to get into the truck, [the defendant] started to hit her, started fighting her, hitting her in the head, and my husband, Virgil, grabbed her arm to pull her up into the truck, and as he was pulling her into the truck, [the defendant] pulled out a knife that came from behind his back, and started stabbing at her, and he caught her on her ankle." The victim escaped when her family pulled her into their vehicle car and drove away. However, two weeks later, the victim returned to live with the defendant.

Dr. Pamela Auble was the only defense witness to testify at trial. She said that the defendant had an IQ of 65 when she tested him. He read at a third grade level and could write, although his spelling was not "very good." She described her analysis of the defendant:

> He is suffering from an adjustment disorder with anxiety and depression which is just simply a reaction to the circumstances in which he feels badly. He feels anxious and depressed. He suffers from intermittent explosive disorder, which is a disorder in which – it is impulse control disorder in which people lose control of themselves, even without much provocation. They can lash out and sort of have a rage attack is what it is. It is often associated with his cognitive deficits; deficits in reasoning and in flexibility, which, in fact, he showed on my testing. He also had some language problems. He has a history of alcohol abuse. That would be a diagnosis, and right now, he is functioning in a retarded range. I don't think he has always been retarded from the school records, but that is where his functioning is right now.

Dr. Auble testified that she had reviewed the facts of the matter for which the defendant was then being tried and found "they were consistent with an outburst of anger that resulted in a physical altercation that did not appear to be planned out with any forethought particularly." In her opinion, the defendant was not capable, at the time of the crime, of forming the mental state for first or second degree murder.

## ANALYSIS

### I. Motions to Suppress

The defendant filed a motion to suppress the cigarette lighter and pocketknife seized from him, arguing that there was no "reasonable and articulable suspicion necessary to justify" the search of his person and, even if the search were justified, its scope was beyond that allowed. Additionally, he filed a motion to suppress the search of his home, arguing that his "consent to the search was not unequivocally, specifically, and intelligently given" but was the "product of duress and coercion." The defendant argues on appeal that the trial court erred in denying both of these motions, claims which we now will review.

### A. Standard of Review

In State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996), our supreme court clarified the standard of review to be applied to trial court rulings on suppression issues:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.... Hereafter, the proper standard to be applied in reviewing suppression issues is the "preponderance of the evidence" standard.

"The application of the law to the facts found by the trial court, however, is a question of law which this Court reviews de novo." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). Additionally, evidence introduced both at trial and a suppression hearing may be considered when evaluating a trial court's ruling on a pretrial motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

## B. Applicable Law

The Fourth Amendment of the United States Constitution and Article I, Section 7, of the Tennessee Constitution protect against unreasonable searches and seizures.[2] To that end, both constitutions set forth the requirement of a warrant to safeguard the right to be secure in our persons and houses from "'arbitrary invasions of government officials.'" State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997) (quoting Camara v. Municipal Court, 387 U.S. 523, 528, 87 S. Ct. 1727, 1730, 18 L. Ed. 2d 930 (1967)). "Under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998). Several exceptions to the warrant requirement exist, one of which is a protective frisk, commonly referred to as a "Terry frisk," explained by Terry v. Ohio, 392 U.S. 1, 30-31, 88 S. Ct. 1868, 1884-85, 20 L. Ed. 2d 889 (1968):

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.

When assessing the reasonableness of the officer's suspicion, the court must determine whether there were "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id., 392 U.S. at 21, 88 S. Ct. at 1879 (footnote omitted). "The officer need not be absolutely certain that the individual is armed," id., 392 U.S. at 27, 88 S. Ct. at 1884, for the purpose of a Terry frisk is the protection of the police officer and any others who may be nearby. Id., 392 U.S. at 29, 88 S. Ct. at 1884. Thus, a Terry frisk passes constitutional muster so long as the police officer had a reasonable, particularized suspicion that the suspect is armed. Bridges, 963 S.W.2d at 502.

Evaluating the reasonableness of a police officer's suspicion requires a fact specific analysis, Terry, 392 U.S. at 30, 88 S. Ct. at 1884, and consideration can be given to the nature of the crime

---

[2] Although not a mirror image of its constitutional counterpart, "Article I, § 7, is identical in intent and purpose with the Fourth Amendment." Sneed v. State, 221 Tenn. 6, 13, 423 S.W.2d 857, 860 (1968).

suspected.  <u>State v. Winn</u>, 974 S.W.2d 700, 703 (Tenn. Crim. App. 1998) ("A frisk has been upheld as reasonable when the suspected crime might typically involve the use of a weapon; for example, a suspicion of robbery, burglary, rape, assault with a weapon, homicide, and large scale narcotics trafficking might allow an officer to reasonably infer that a weapon might be in the possession of the suspect.").

### C.  Search of the Defendant's Residence

The defendant first filed, and the trial court denied, a pretrial motion to suppress evidence obtained during a search of his house.  He argues that his signed consent to the search was ineffective because it was not given voluntarily or intelligently.

Detective Carrell testified at the pretrial hearing on the motion to suppress the search of the defendant's house of the defendant's signing the consent form:

> Q    And tell us about the consent to search.  Who got that form?
>
> A    Officer Pearce had – I think his police car was the closest to the front porch.  He said, I've got some – I requested it and he went to the car and I believe he got it out of his trunk and brought it to the porch.  I was busy doing something, I don't know, and he handed it to Detective Cleek.  I think Detective Cleek deferred to me and I said, Go ahead and read to him.  And I stood there and he read it to him.
>
> Q    And did Mr. Pointer appear to understand the meaning of what Detective Cleek was reading?
>
> A    Yes, he did.  Detective Cleek read it, read the whole thing off the paper, and as I recall, he said, Do you have any questions or is there anything you don't understand about it?  And I remember he told him he could stop it at anytime, just let us know, just tell us to stop, and you have that right.  I do remember Mr. Pointer – I think maybe Steve, Detective Cleek said, If you want to read it, you can.  And he said, I know how to read.  And he said, I do want to read it.  So he took it and he read it.  After he read it, he signed it.  And then I think two or three other officers signed it.
>
> Q    Did he have any, or appear to have any difficulty in signing his name?
>
> A    Not at all.

The consent form signed by the defendant stated as follows:

> I, Jerry Wayne Pointer, having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorize Det. David Carrell and other Det. and I.D. Unit criminal investigators for the Metropolitan Police Department, Nashville, Davidson County, Tennessee, to conduct a complete search of my premises located at 2407 Buchanan St. These investigators are authorized by me to take from my premises any letters, papers, materials or other property which they may desire.
>
> This written permission is being given by me to the above named criminal investigators voluntarily and without threats or promises of any kind.

The form bears the signature of the defendant, as well as that of Officers Pearce, Boles, and Cleek.

To support the argument that his consent was given unintelligently, the defendant presented the testimony of Dr. Pamela Auble, a psychologist. At the hearing, she testified that the defendant's current IQ of 65 put him in the "retarded range" and that he read at a third grade level.[3] Dr. Auble said that this reading level rendered him incapable of comprehending the consent form. Although the defendant told the police that he had "gone all the way in school" when he requested to read the consent form, his school records show that he left school in the ninth grade.[4] Dr. Auble opined that the consent form required a college education to understand. On cross-examination, Dr. Auble testified that the defendant understood and followed all of the instructions required to take the tests she administered and it was possible that he could understand the instructions when explained to him orally, even if reading them may have posed a problem.

Following the pretrial hearing on the defendant's motion to suppress the search of his house, the trial court concluded that the search was lawful:

> Well, I have heard the proof on this issue and I think Dr. Auble testified that his level of intelligence, and then she said the form was given to someone and this sort of, I guess, is somewhat hearsay, that Dr. Casey Allen, who is with the Bill Wilkerson Center here, indicates that form would require somebody with 16 years of

---

[3] Apparently, the defendant's IQ has decreased with age. When tested in elementary school, his IQ was as high as 79 which is above the retarded range.

[4] During his evaluation by Dr. Auble, the defendant maintained that he did, in fact, graduate from high school.

education, which would require, I can add up, would require a college degree in order to understand a consent form.

The consent form is what it is and that is that somebody has been advised of their rights not to have a search made of the premises without a search warrant, and their right to refuse to consent to a search. And, therefore, they authorize the investigator to take from the premises any letters, papers, materials or other property, and the permission is given without threats or promises of any kind.

Now, I have paraphrased. There are other words in there but I think to its essence that really isn't a form that would require a college education to comprehend. But that being aside, I think the testimony from Detective Cleek, Pearce, and Detective Carrell was that it was Detective Cleek who read him the form, who went over the words to him, he understood, they explained to him that they could stop. Apparently he questioned about that. He then chose to read it for himself. I do not believe there is any evidence in the record that Mr. Pointer cannot read. And he clearly signed the form and has done so. There is no evidence that there was any animosity, any force, coercion in any event in this situation. There is also testimony from the officers that he was not drinking, he appeared to understand and was cooperative. And, as a matter of fact, he then, at one point, and I believe this was a subject of another hearing, went and talked to somebody who, then he decided not to make any further statements. So he, obviously, had the capacity to stop the police and they honored that request.

So all that being aside, I will find that – I will deny your motion. I find that this consent was given voluntarily, knowingly and understandingly, and it was not withdrawn. So that motion is denied.

Regarding the trial court's finding that he consented to the search of his house, the defendant contends on appeal that his consent was "an act of necessity rather than volition," relying on the facts that: (1) the police came to his door to ask him questions; (2) he answered the door in his underwear; (3) it was after midnight; and (4) the police returned for further questioning. We now will assess these claims.

In determining whether the defendant voluntarily consented to the search, we consider the "totality of the circumstances," as explained by State v. Ashworth, 3 S.W.3d 25, 28-29 (Tenn. Crim. App. 1999):

> The burden of proof rests upon the State to show, by a preponderance of the evidence, that the consent to a warrantless search was given freely and voluntarily. Schneckloth [v. Bustamonte], 412 U.S. [218,] 248-49, 93 S. Ct. [2041,] 2059 [(1973)]; Bumper v. North Carolina, 391 U.S. 543, 548, 88 S. Ct. 1788, 1792, 20 L. Ed. 2d 797 (1968); [State v.] Bartram, 925 S.W.2d [227,] 230 [Tenn. 1996].
>
> The question of whether an accused voluntarily consented to the search is a question of fact which focuses upon the totality of the circumstances. Schneckloth, 412 U.S. at 248-49, 93 S. Ct. at 2059. "In order to pass constitutional muster, consent to search must be unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." State v. Brown, 836 S.W.2d 530, 547 (Tenn. 1992).

Initially, we note that the defendant was not in custody at the time and the police were rightly in his presence when his consent was requested. Although unclear from the record, it appears that the police asked the defendant for his consent within a few minutes of their return to his house, and asked only once. The record is absent of any evidence of express or implied duress or coercion, of threats or force, or of deceit or trickery. There is no evidence that the defendant was intoxicated other than the conflicting stories he gave to explain his broken window, and three police officers testified that he did not appear intoxicated. According to his presentence report, he had at least six prior arrests, some resulting in multiple charges, beginning in 1977, when he was 20 years old. It appears that he had been imprisoned on at least three prior occasions, in 1982 following convictions for burglary second degree, arson, and larceny from the person; in 1983 for larceny of an automobile; and in 1989 for second degree murder. He was on parole from the second degree murder conviction at the time of the offense which is the basis for the present appeal. Thus, we conclude that the defendant had substantial prior experience with law enforcement officers, and was aware of his right to refuse to consent to the search.

As we have previously set out, Dr. Auble testified at the hearing that she measured the defendant's IQ at 65 and his reading ability at a third grade level. However, the trial court disagreed with Dr. Auble's opinion that the consent form could be understood only by a person with a college education. The court noted that officers testified that they read and explained the consent form to the defendant, explicitly telling him that he had the right to refuse to give consent, and that he appeared to understand the consent form and what it entailed. Later in the evening, the defendant invoked his Miranda rights as he was being questioned. Accordingly, we conclude that the record does not preponderate against the trial court's finding that the defendant gave his voluntary, knowing, and understanding consent to the search of his house.

## D. Search of the Defendant's Person

The defendant's motion to suppress the cigarette lighter found in his pocket was argued on March 16, 2001. He argues that the lighter should have been suppressed "because Officer Pearce did not have reasonable suspicion to believe that the defendant was armed with a weapon when he conducted the 'pat-down' of the defendant." Alternatively, the defendant argues that even if there was "reasonable suspicion that [the defendant] was involved in the victim's death, the search of the defendant's person" exceeded the permissible scope to be searched.

At the pretrial hearing on the defendant's motion to suppress the search of his house, Officer Pearce explained the basis for the search and its results:

> Q    Did you go back and introduce Mr. Pointer to Detective Carrell?
>
> A    Yes, ma'am. We actually had to knock on the door again. Mr. Pointer said he'd be at home so we went back over there and knocked on the door again. Mr. Pointer came to the door dressed in a pair of blue jeans and a t-shirt this time, very well-pressed, clean blue jeans and a white t-shirt as I recall. He came outside and there was a threat so I asked him if I could pat him down and make sure he didn't have any weapons on him.
>
> Q    You didn't do that the first time?
>
> A    . . . He had on a pair of boxer shorts so we pretty much had the idea that he didn't have anything on him. So I patted him down; I forget which pocket it was in but in one pocket I retrieved a knife, and the other pocket I felt what could have, again, been a knife, but it ended up being a cigarette lighter. I retrieved those two items, knowing that somebody had burned next door, and they can turn cigarette lighters into torches and all kinds of stuff these days, so I retrieved those two items and we were standing there on the porch and I was holding them in my hand as Detective Carrell started questioning him.

The trial court denied the motion, concluding that, based upon the reasonable suspicion of the police officers and the need to make certain of their safety, the search was permissible:

> Okay. [Defense counsel], I'm going to address this issue, but I'm not so convinced it is not waived for your not having raised it

prior to this point, but the issue is, and I think what you need to keep in mind is the whole constellation of why the police were even there in the first place. They are responding to a call and they find this body that has been burned in the lot next to the house that Mr. Pointer lives in. They go and talk to him. Detective Cleek is suspicious, based on just the way Mr. Pointer asked questions.

They get the name of Teresa Barsdale. They go to the computer, try to check this out. They discuss among themselves about Mr. Pointer. They go back to the door, and he is dressed in a different outfit.

Now the first time they see him, he is boxer shorts, so the police officer said they pretty much know he is not armed with a weapon, but he has been back in the house. He has changed clothes. The police officers are there investigating a homicide and they are becoming very suspicious about Mr. Pointer, maybe not to the point of arresting him, but this is sort of a <u>Terry</u> stop for officer safety, and though it is unclear in my notes and, obviously, from the transcript because nobody ever asked him, he said he asked him if he could pat him down, and then patted him down.

Now he could have very well have said, yes, go ahead in which case we have no issue, but in any event, I'm going to find that it is, based on reasonable suspicion and for the officer's safety at the time and allow the State to introduce the cigarette lighter, so I deny your motion.

Implicit in the trial court's ruling on the search of the defendant's person was the finding that officers had reasonable suspicion to pat down the defendant. As the court recounted, officers had discovered a burned body in the backyard of a house next door to the defendant's residence. He gave conflicting answers to their initial questions, changed clothes, and was acting in a fashion which they believed to be suspicious, given the facts. All of these circumstances match the situation in which officers may proceed, pursuant to <u>Terry</u>, and pat down a suspect. Explaining the search, Officer Pearce testified at the suppression hearing that "in one pocket I retrieved the knife, and in the other pocket, I felt what could have, again, been a knife, but it ended up being a cigarette lighter." The defendant argues that the cigarette lighter was seized after officers had exceeded the limits of a pat-down search. Reviewing conflicting holdings as to the permissible scope of a pat-down search, 4 Wayne R. LaFave, <u>Search and Seizure: A Treatise on the Fourth Amendment</u> § 9.5(c) (3d ed. 1996), explains what the author believes as to the "better view":

Under the better view, then, a search is not permissible when the object felt is soft in nature. If the object felt is hard, then the

-14-

question is whether its "size or density" is such that it might be a weapon. But because "weapons are not always of an easily discernible shape," it is not inevitably essential that the officer feel the outline of a pistol or something of that nature. Somewhat more leeway must be allowed upon "the feeling of a hard object of substantial size, the precise shape or nature of which is not discernible through outer clothing," which is most likely to occur when the suspect is wearing heavy clothing. Under this approach, courts have upheld as proper searches which turned up certain objects other than guns, such as a pocket tape recorder, a pipe, a pair of pliers, cigarette lighter, several keys taped together, a metal money clip full of money, tightly wrapped bags of crack cocaine, or a prescription bottle.

We conclude that the trial court did not err in its determination that the cigarette lighter was lawfully seized from the defendant.

## II. Admissibility of the Defendant's Prior Convictions

The defendant argues that it was error for the trial court to rule that two 1983 burglary and larceny convictions could be utilized for impeachment purposes if he testified at trial. He contends that the convictions were inadmissible because they were more than ten years old, and (1) the State failed to provide adequate notice of its intent to use them; (2) the trial court failed to set forth specific facts to establish their probative value; and (3) whatever probative value they had did not outweigh their prejudicial effect. In our view, we first note that while ruling that the defendant could be questioned about his burglary and larceny convictions, the trial court also instructed that the State could not utilize in its cross-examination the defendant's 1989 second degree murder conviction for which he then was on parole.

This issue is governed by Tennessee Rule of Evidence 609, which provides that a conviction may be used to impeach the testimony of an accused in a criminal prosecution if the following four conditions are satisfied: (1) the conviction is for a crime punishable by death or imprisonment in excess of one year, or the conviction is for a misdemeanor which involved dishonesty or false statement; (2) less than ten years has elapsed between the date the accused was released from confinement and the commencement of the subject prosecution; (3) the State gives reasonable pretrial written notice of the particular conviction or convictions it intends to use as impeachment; and (4) the trial court concludes that the probative value of the prior conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues. State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999); Tenn. R. Evid. 609.

Additional safeguards are required if a conviction is more than ten years old, as were these. Such convictions are only admissible if: (1) advance notice sufficient to provide the adverse party with a fair opportunity to contest the use of such evidence is given; and (2) the trial court determines

that the probable value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect. Tenn. R. Evid. 609(b). The trial court's decision to admit prior convictions for impeachment purposes will not be reversed on appeal unless it appears from the record that the trial court abused its discretion. State v. Blanton, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996).

At a pretrial hearing, the trial court explained why the convictions could be used for the purpose of impeachment if the defendant testified:

> Now one of the things I have to look at is the probative value, the notice that you might have. Clearly, you've been on notice for some period of time.
>
> I think I also have to look at the total picture, and that is the State, he does have another conviction, murder, for which he was in custody a good period of that time, and I'm not going to allow the State to use that absent some opening of the door to make that relevant.
>
> Now keep in mind that it is still there, so that if Mr. Pointer were to testify, he could very easily open that door on that one.
>
> . . . .
>
> But given the facts of this case, and that is – and I've heard enough hearings on this particular issue, that his credibility may, in fact, become very, very crucial, and what the State is seeking to introduce are two convictions: one is a burglary, which is definitely a crime of dishonesty, and larceny, though it says from the person, it still also goes to the very heart of what the jury would have to determine.
>
> I think that in the interest of justice, given the notice that has been given, that I'm going to allow the State to use those for the purpose of conviction, not the murder.
>
> . . . .
>
> So the burglary and the larceny from a person, given this case, and the crucial issues with regard to credibility, and the fact that these are crimes that go to the very heart of credibility. It is not like a possession for resale. It is not something that is not directly related

-16-

to credibility. Larceny is and so is burglary. These are crimes, basically crimes of dishonesty.

The purpose of the notice requirement is to provide the opponent sufficient time to contest the use of the evidence in advance of the cross-examination. See Neil P. Cohen et al., Tennessee Law of Evidence, § 6.09[6][c] (4th ed. 2000). Here, the defendant learned of the State's intent to use the convictions at the March 16, 2001, pretrial motion hearing, with trial to begin four days later. However, he did not object to the sufficiency of the notice or request a continuance to allow more time to contest the use of the evidence. Accordingly, we conclude that this argument is waived. However, even if it were not waived, we would conclude, for reasons which we will explain, that it was without merit.

In determining whether the probative value of a conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues, a trial court should assess, as the trial court did in this matter, the similarity between the crime on trial and the crime underlying the impeaching conviction and analyze the relevance the impeaching conviction has to the issue of credibility. State v. Farmer, 841 S.W.2d 837, 839 (Tenn. Crim. App. 1992). The trial court made the pretrial determination that the defendant's prior second degree murder conviction was inadmissible because of its similarity to the crime at issue. In assessing the probative value of the burglary and larceny convictions, however, the trial court determined that they go "to the very heart of what the jury would have to determine." See State v. Baker, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997) (burglary and theft highly probative of credibility because both involve dishonesty). Thus, as required by Rule 609, the trial court articulated specific facts establishing the probative value of the convictions and then balancing it against the prejudicial effect. We cannot conclude that the trial court abused its discretion in determining that the probative value of the convictions substantially outweighed their prejudicial effect.

### III. Admissibility of Prior Violent Incident

The defendant argues that it was error for the trial court to allow the testimony of Larry Clopton and Fay Cummins about a prior violent altercation between the victim and the defendant, contending that the testimony was inadmissible under any Tennessee Rule of Evidence 404(b) exception or, in the alternative, that it should have been excluded under Rule 403 as a "needless presentation of cumulative evidence."

Rule 404(b) provides as follows:

> Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

Generally, this rule is one of exclusion, and evidence is inadmissible that an accused has committed some other crime or bad act independent of that for which he is charged. See State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993). If, however, evidence of the other act is relevant to some matter actually at issue in the case on trial and its probative value is not outweighed by the danger of its prejudicial effect, the evidence may be admitted. See id. at 254. The recognized exceptions to the exclusionary rule of 404(b) are when evidence is offered to prove the motive of the defendant, his identity, his intent, the absence of mistake, opportunity, or as a part of a common scheme or plan. See Bunch v. State, 605 S.W.2d 227, 229 (Tenn. 1980); Tenn. R. Evid. 404, Advisory Commission Cmt.

When the trial court has substantially complied with the requirements of Rule 404(b), this court reviews its decision to admit or exclude evidence under an abuse of discretion standard. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). The trial court in this case conducted the appropriate jury-out hearing, concluding that the evidence was probative of two material issues – intent and premeditation – and that the prejudicial effect did not outweigh the probative value. Accordingly, we review this issue utilizing an abuse of discretion standard.

This evidence first was discussed in a pretrial hearing on February 20, 2001, with the trial court advising counsel of the determinations to be made in this regard at the trial:

> But, first of all, in a 404(B), I have to have a hearing outside the jury's presence which we're doing now and will do in the future if we need to. I have to determine that a material issue actually exists, other than the propensity issue. That is, that the State has a reason for introducing this testimony other than that based on a character trait. And that I have to determine whether or not this other crime evidence, whether or not the State has proved it by clear and convincing evidence and that the defendant was involved. And clearly, just based on what I've heard, if you have eye witnesses to this and observed Mr. Pointer doing these acts that that would

-18-

certainly go well toward that clear and convincing test. And then I guess whether the probative value is outweighed by the unfair prejudice. Given that the issues I see that you're trying as to motive, intent, possibly some identity, but let me make this statement, it would appear to me that that would be admissible with a limiting instruction.

Now, for the purposes of trial preparation, you can assume that some of that may come in but even if I don't admit it, based on what I hear at trial, because I have to determine at the point in time it comes in that there is a material issue, that it may then come in in rebuttal as to Dr. Auble's testimony.

At trial, the parties again argued this matter, following a jury-out hearing at which Larry Clopton testified, and the trial court then explained why his testimony would be allowed:

All right, so 404(b), requires, one, that I have a jury-out hearing, which I've done. We've had some discussions about this in the past, to hear exactly what it is, whether or not there is a material issue. I think there clearly is in this particular case, not only intent, but premeditation.

Also, at this point in the trial, I think there are two things that I also need to consider. One is though it is not evidence, but at least the statements made in the opening statements are clearly in front of the jury and I can consider that in doing this, but I think more important to me in terms of my decision is the cross-examination of Detective Carrell, where [junior defense counsel] spent a great deal of time going over the statements that Detective Carrell made to the defendant and clearly has in front of the jury about whether this was a spur of the moment, heat of passion sort of issue, which means that issue is squarely in front of the court, even before Dr. Auble testifies.

The State's got to prove premeditation, and that's that it was done after exercise and reflection and judgment and also it is important because the charge says that they have to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. I talked to them about that yesterday. I'll tell them that again.

Given all that, I think the probative value is far greater than the prejudice. Now, of course, I will instruct the jury appropriately, and that is that they are to consider this for various – and they are

limited to the things that they can consider this for, but, and quite honestly, I think also – I understand your point, [senior defense counsel], about why he has to go on, but the fact that he is standing there calmly talking about his brothers, he is assuring these people that nothing is going to happen, and then he starts in again goes to this very issue, especially about what Detective Carrell in that cross-examination, because it shows that he is very calm and then when he is in her presence, he is so determined to do otherwise, so I think the jury can hear all that in terms of the relationship of the parties, whether or not, and it goes to the premeditation and intent, so I will instruct them appropriately but I'm going to allow that.

The defendant argues on appeal that the testimony of the prior incident was irrelevant to his intent or motive to commit the crime, and did nothing more than demonstrate his propensity for violence. However, evidence of violent episodes between a defendant and a victim are admissible to establish motive for a killing. State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993); see also State v. Turnbill, 640 S.W.2d 40, 47 (Tenn. Crim. App. 1982) (prior relations between the victim and the defendant were relevant on the question of intent); State v. Glebock, 616 S.W.2d 897, 905-06 (Tenn. Crim. App. 1981) (relations existing between the victim and the defendant prior to the commission of the crime were relevant and indicative of hostility toward the victim and a settled purpose to harm or injure). The testimony here depicted a turbulent relationship in which the defendant had physically threatened and attacked the victim. The trial court, immediately following the testimony, instructed the jury that the evidence was to be considered only as to motive, intent, or premeditation:

> All right, before cross-examination, ladies and gentlemen, let me give you some admonitions about how you are to receive this testimony.
>
> If from the proof you find that the defendant has committed other crimes from that which he is on trial, you may not consider such evidence to prove his disposition to commit such crime as he is on trial. This evidence may only be considered by you for the limited purpose of determining whether it provides, [A], a motive; that is, such evidence may be considered by you if it tends to show a motive of the defendant for the commission of the offense presently charged; B, the defendant's intent; that is, such evidence may be considered by you if it tends to establish that the defendant actually intended to commit the crime with which he is presently charged; or C, the defendant's premeditation. Such evidence of other crimes, if considered by you for any purpose, must not be considered for any other purpose than that which I've previously stated.

Because the testimony in question had the legitimate nonpropensity purpose to show motive or intent, we conclude that the trial court did not abuse its discretion by admitting the testimony under Rule 404(b).

Alternatively, the defendant argues that the evidence should have been excluded under Rule 403 as "needless presentation of cumulative evidence" because two witnesses testified about the same incident. Rule 403 provides that, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of . . . needless presentation of cumulative evidence." The "cumulative evidence" category of exclusion under Rule 403 is directed towards promoting judicial economy and efficiency rather than with excluding prejudicial evidence. See Neil P. Cohen et al., Tennessee Law of Evidence, § 4.03[7] (4th ed. 2000). The admission of evidence is largely discretionary and the trial judge's discretion will not be disturbed on appeal unless there has been clear abuse. State v. Harris, 30 S.W.3d 345, 350 (Tenn. Crim. App. 1999). There is no basis for our doing so here.

### IV. Sufficiency of the Evidence

The defendant argues that the evidence is insufficient to support a conviction for first degree premeditated murder, because the State did not establish that the killing was premeditated. By this argument, the evidence is only sufficient to support convictions for voluntary manslaughter, reckless homicide, or, at most, second degree murder, all of which were charged to the jury as lesser-included offenses.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial

> forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of first degree premeditated murder, which is defined in Tennessee Code Annotated section 39-13-202 as:

> (1) A premeditated and intentional killing of another;
>
> . . . .
>
> (d) As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(a)(1), (d) (1997).

The "element of premeditation is a question of fact" for the jury to determine based upon a consideration of all the evidence. State v. Suttles, 30 S.W.3d 252, 261 (Tenn.), cert. denied, 531 U.S. 967, 121 S. Ct. 401, 148 L. Ed. 2d 310 (2000) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)). Premeditation may be inferred from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). The circumstantial evidence of premeditation must, however, be "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). There are several factors that tend to evidence premeditation:

> the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the

> killing for concealment of the crime, and calmness immediately after the killing.

Bland, 958 S.W.2d at 660.

While the defendant contends that none of these factors apply, we respectfully disagree. The jury could have found that the defendant choked the victim for three or four minutes, wrapped a wire around her neck and wrists,[5] and set her body on fire. Any of these acts, done sequentially, was independently sufficient to cause death. The violent altercation preceding the murder is evidence of the defendant's intent to kill the victim. See Turnbill, 640 S.W.2d at 47; Glebock, 616 S.W.2d at 905-06. After the killing, the defendant changed his clothes and attempted to clean his house of the victim's blood. Applying these factors to the facts of this case, a reasonable jury could have concluded that the murder was the premeditated result of a dutifully executed plan. Accordingly, we conclude that the evidence supports the defendant's conviction for first degree premeditated murder.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

---

[5] A "deadly weapon" is statutorily defined as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tenn. Code Ann. § 39-11-106(5)(B) (1997).